IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

MARVIN RAY BERRY                                                                   PLAINTIFF

VS.                                                         CIVIL ACTION NO. 3:14-cv-665-CWR-FKB

ROLANDO ABANGAN, ET AL.                                                       DEFENDANTS

## REPORT AND RECOMMENDATION

This is a § 1983 action filed by Marvin Ray Berry, a state prisoner in the custody of the Mississippi Department of Corrections ("MDOC"). Berry alleges that the defendants violated his constitutional right to medical care while he was housed at the Central Mississippi Correctional Facility ("CMCF") in Pearl, Mississippi. Named as Defendants are former and present MDOC employees who held the following positions at the relevant time: MDOC Commissioner Christopher Epps, MDOC Medical Director Gloria Perry, CMCF Superintendent Michael White, and CMCF Associate Deputy Warden Joann Shivers (the "MDOC Defendants"). Also named as Defendants are Wexford Health Sources, Inc. ("Wexford"), which had contracted with MDOC to provide medical services, and several Wexford employees: Shannon Dorris, Wanda Lunski, Cynthia Allen, Donald Horne, Henry Jackson, Rebecca Pope, Monte Bishoff, and Rolando Abangan (the "Wexford Defendants").

Before the Court are several motions:

1. A Motion for Summary Judgment [118] filed by the Wexford Defendants;

2. A Motion for Summary Judgment [120] filed by the MDOC Defendants;

˘1˘

3. A Motion for Summary Judgment [130] filed by Plaintiff Berry;[1]

4. A Cross-motion for Summary Judgment as to the MDOC Defendants [129] filed by Plaintiff Berry;

5. A Cross-motion for Summary Judgment as to the Wexford Defendants [141] filed by Plaintiff Berry.

For the reasons set forth in this Report and Recommendation, the undersigned recommends that the defendants' summary judgment motions [118] and [120] be granted, and that Berry's summary judgment motions [129], [130], and [141] be denied.

## I.   FACTS AND CLAIMS

Berry is a post-conviction inmate.  In his complaint [1], he alleges that the defendants violated his constitutional rights by failing to provide him adequate medical treatment in response to his complaints of chest pain between January 19 and March 22, 2014. [1] at 9-12.[2] He claims that the defendants' deliberate indifference to his serious medical needs caused him to suffer an acute myocardial infarction that resulted in hospitalization and surgery. In sum, he argues that the defendants "failed to adequately treat his myocardial infarction or heart attack and provided nothing more than 'monitoring' and 'treatment' so cursory as it amounted to no treatment at all."  [141] at 5.

The medical records show that during January and March 2014, Berry was 51 years old. He was 5 feet, 9 inches tall, weighed 227 pounds, and had a history of hypertension since the age of 38 years, as well as diabetes and hyperlipidemia since the age of 47 years. *See* [124-5] at 85.

---

[1] In later filings, Berry asks the Court to disregard his Motion for Summary Judgment at [130]. [137] at 2; [141] at 1.
[2] In his response, Berry states that his symptoms dated back to December 10, 2013. [129] at 3.

Prior to 2014, Berry also had ongoing symptoms of dyspnea and cough. *See*, *e.g.,* [124-8] at 60, [124-6] at 60.

Based on the medical records from January through March 2014 and Berry's filings, a timeline of relevant events is as follows:

> On January 19, Berry submitted a sick call request complaining of chest pain, tightness in his chest, and shortness of breath. [124-6] at 26. On January 31, Defendant Nurse Jackson examined Berry and noted that he had no complaints of chest pain and that Berry stated that he was "feeling fine." *Id.* at 20-21. Berry disputes that he made this statement. [129] at 3-4; [141] at 8.
>
> On February 10, Berry submitted a sick call request regarding a bump on his finger. [124-6] at 18. After seeing Berry on February 14, a nurse referred him to medical. *Id.* at 16. On February 19, Defendant Rolando Abangan, M.D., examined Berry and ordered an x-ray of his hand. *Id.* at 11. The x-ray was normal. *Id.* at 10. The medical records for Berry's February 19 examination show a pulse rate of 83, regular pulse rhythm, blood pressure of 122/83, and no complaints of chest pain. *Id.* at 11.
>
> On March 16, Berry received treatment at CMCF's medical clinic. *Id.* at 2. Berry presented to the clinic in a wheelchair, in some distress, with complaints of chest pain and pain going up his neck and down his left arm. *Id.* Berry reported to Defendant Nurse Bishoff that the pain had been there about a week but had been much less intense. *Id.* Upon arrival in the clinic, Berry's blood pressure was 199/122. *Id.* Nurse Bishoff gave him Clonidine and nitroglycerin per protocol. *Id.* Shortly thereafter, Berry's blood pressure went down to 136/102. *Id.* Bishoff also administered an EKG and conducted a

troponin test. *Id.* The EKG showed normal sinus rhythm with "ST & T wave abnormality," and Bishoff noted, "consider inferior ischemia." *Id*. The troponin test was negative. *Id.*[3] By 8:15 a.m. and with his blood pressure down to 142/92 and pulse rate at 85, Berry reported that he was "much better," and he was told to take his morning medications and return for follow-up. *Id*. Bishoff discussed Berry's case with Defendant Horne, a nurse practitioner, and included instructions of "continue to monitor." *Id*. On two follow-up visits in the clinic that day, Berry had blood pressure of 108/70 and a pulse rate of 73 at 1:42 p.m., and blood pressure of 130/84 and a pulse rate of 74 at 4:58 p.m. *Id*. Berry was returned to his zone, and Bishoff noted in the medical record that Berry had a chronic care appointment for hypertension "soon." *Id.*

On March 17, Dr. Bimal D. Aujla saw Berry for a psychiatric visit. [124-5] at 96. Berry asserts that he advised Dr. Aujla that he was experiencing heart attack symptoms and requested to see a medical doctor. [129] at 4-5. Dr. Aujla did not note that Berry made any complaints of chest pain. [124-5] at 96-97.

In a sick call request dated March 17, Berry states that he obtained treatment on March 16, but that he was still having shortness of breath, chest pains, numbness in his right hand, and a hard time swallowing. *Id*. at 20.

Before noon on March 18, Bishoff saw Berry in the clinic. *Id.* at 95. At that time, Berry had blood pressure of 126/84, a pulse rate of 86, and regular heart rhythm. *Id*.

On the morning of March 19, Nurse Practitioner Horne conducted an examination of Berry in the chronic care clinic. *Id.* at 85-93. Berry's cardiovascular, endocrine, and

---

[3] Berry asserts that the medical record does not contain troponin test results. [141] at 9.

hypertension conditions were reviewed, tests were run, and prescriptions were renewed. *Id.* At that time, Berry had blood pressure of 118/71, a pulse rate of 82, and regular pulse rhythm. *Id*.

On the evening of March 19, an MDOC officer called Defendant Nurse Lunski and reported that Berry was complaining of chest pain. *Id*. at 84. Nurse Lunski reviewed Berry's record and noted that he had a "good check up" in the chronic care clinic earlier that day. *Id*. Lunski instructed that Berry lie down and that the officer call back, if the pain continued. *Id*. Shortly thereafter, Berry presented to the clinic with complaints of shortness of breath and chest pain. *Id*. at 82. Berry had blood pressure of 182/117 and a pulse rate of 104. Nurse Lunski gave Berry Clonidine and nitroglycerin. *Id*. About an hour later at 10:45 p.m., Berry's blood pressure had gone down to 150/102, his pulse rate had reduced to 82, and Lunski instructed to have an officer call the clinic if Berry had further pain. *Id*. Based on the medical records, it appears that Berry returned to the clinic that night. The medical records contain an EKG conducted at 2:51 a.m. on March 20, *see id*. at 81, and Nurse Lunski completed a sick call request for Berry on March 20, which states that Berry had been to the clinic two times during the night and that she had done an EKG. *Id*. at 94. Nurse Lunski noted that after she administered medication, Berry's blood pressure went down to 140/100 and that Berry was in no acute distress. *Id*.

At 8:57 p.m. on March 20, Defendant Nurse Pope recorded that she received a phone call from an officer, informing her that Berry was complaining of chest pain. *Id.* at 80. Nurse Pope instructed the officer that Berry could come to the clinic. *Id.*[4]

---

[4] At 10:25 p.m. on March 20, Berry's son sent an email to various MDOC personnel, expressing concern for his

At 6:06 a.m. on March 21, Defendant Nurse Pope placed a phone call to Berry's zone to inquire about Berry and his complaints of chest pain. *Id.* at 79. The officer reported that Berry had had no further complaints of chest pain and had slept quietly without further complaint. *Id.* Pope instructed the officer to call the clinic, if Berry had any complaints of chest pain, discomfort, or any other problems or concerns. *Id.*

Berry asserts that, on March 21, he went to the clinic complaining of severe chest pain and pleaded to be taken to the hospital, but that medical personnel advised him that his symptoms were caused by acid reflux and anxiety. [129] at 7. He states that the medical record does not reflect his March 21 clinic visit. *Id.* Although the medical records do not contain a March 21 clinic note, the records show that Berry was seen in the clinic on the evening of March 21-22.

That evening, Berry presented to the clinic stating that he had been having chest pain for the last three to four hours. [124-5] at 26. Berry described his pain to Defendant Nurse Allen as "sharp, tightness" in his chest with "pain in his arm," and told her that he felt "like his heart [was] about to explode." *Id.* Berry also stated that he had taken someone else's blood pressure medication before coming to the clinic. *Id.* Nurse Allen ran an EKG, which at 12:03 a.m. indicated "[m]arked abnormality, possible inferior subendocardial injury." Id. at 77. Nurse Allen called Defendant Nurse Practitioner Dorris,

---

father's health and treatment. *See* [129-6]. That same night, at 12:11 a.m. and 12:43 a.m. on March 21, Berry's daughter sent emails, expressing displeasure about her father's medical care, but the actual message sent to MDOC personnel is not contained in the copy filed by Berry. *See* [129-7]. At 12:28 p.m. on March 21, Defendant CMCF Superintendent Michael White responded to Berry's son's email and instructed Defendant CMCF Deputy Warden Joann Shivers to "contact medical" and "ensure that [Berry's] needs are addressed." [129-6]. An hour later, at 1:28 p.m. on March 21, Deputy Warden Shivers called the clinic and discussed Berry's medical treatment and follow-up. [124-5] at 78.

who ordered a troponin test. *Id.* The troponin test was negative. *Id*. After receiving the negative troponin test, Dorris advised Nurse Allen to give Berry Lisinopril and instruct Berry to get blood pressure checks over the weekend. *Id.*

At 2:11 a.m. on March 22, Nurse Allen noted that Berry had "just left the clinic . . . stat[ing] that [his chest pain] was better," but that he was back in the clinic with a complaint of severe chest pain. *Id*. at 25. Allen recorded that Berry stated that he felt "like he is dying and is spitting in the trash can." *Id*. She indicated that he had no diaphoresis or vomiting. *Id*. Allen gave Berry nitroglycerin, and Berry calmed down, stating that the medication helped his chest pain. *Id*. Allen also called Nurse Practitioner Dorris again. *Id*. Dorris told Allen to put Berry in the infirmary and that she would be there that morning to examine Berry. *Id*.

At 2:20 a.m. on March 22, Nurse Pope noted that Berry was in the infirmary, was ambulatory without any complaints, and denied any pain or discomfort at that time. *Id*. at 24. At 4:00 a.m., Nurse Pope noted that Berry was asleep without complaint and responded to verbal stimuli. *Id*. Berry disputes that he was asleep. [141] at 15. At 5:46 a.m., Berry's EKG indicated acute myocardial infarction. [124-5] at 76. At 6:00 a.m., Nurse Pope noted that Berry tolerated his diet well without complaints and went back to sleep. *Id*. Berry disputes that he was asleep during this time. [141] at 15. At 6:30 a.m., Nurse Pope recorded that Berry complained of chest pain and that his blood pressure was 170/110. [124-5] at 24. He was given another nitroglycerin pill. *Id*.

At 6:46 a.m. on March 22, Nurse Allen completed an Emergency Report and Transfer Form. *Id*. at 22. In the report, Allen recorded that Berry was experiencing chest

pain and a possible myocardial infarction, and that she had reported the situation to Nurse Practitioner Dorris. *Id.* She noted that his blood pressure was 175/110 and that his evaluation and treatments included an EKG, a troponin test, and administration of nitroglycerin, aspirin, and Clonidine. *Id.* She also ordered a comprehensive metabolic panel, hemoglobin test, and lipid panel. *Id*. Allen identified the transfer destination as Central Mississippi Medical Center ("CMMC"). *Id.*

At 6:52 a.m., Nurse Allen recorded that an EKG had indicated acute myocardial infarction. *Id*. at 21. Allen contacted Nurse Practitioner Dorris again, and Dorris advised her to send Berry to the emergency room by ambulance. *Id*. Allen arranged for an off-site emergency transfer to CMMC. *Id*. at 22. Berry left CMCF for CMMC by ambulance at 7:15 a.m. *Id*.

After arriving at CMMC in Jackson, Mississippi, Berry was diagnosed with acute myocardial infarction and underwent "successful revascularization of the circumflex and left anterior descending arteries." *Id.* at 54. Specifically, Berry underwent "balloon angioplasty and stent placement to occluded circumflex coronary artery" and "stent placement to the proximal left anterior descending artery." *Id*. at 55.

II.     SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure states, in relevant part, that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is genuine if the "'evidence is sufficient to permit a reasonable factfinder to return a verdict for the nonmoving party.'" *Lemoine v. New Horizons Ranch and Center*, 174 F.3d 629,

633 (5th Cir. 1999)(quoting *Colston v. Barnhart*, 146 F.3d 282, 284 (5th Cir.), *cert. denied*, 119 S.Ct. 618 (1998)).  Issues of fact are material if "resolution of the issues might affect the outcome of the suit under governing law."  *Lemoine*, 174 F.3d at 633. The Court does not, "however, in the absence of any proof, assume the nonmoving [or opposing] party could or would prove the necessary facts."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)(en banc)(emphasis omitted).  Moreover, the non-moving party's burden to come forward with "specific facts showing that there is a genuine issue for trial,*"* *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), is not satisfied by "conclusory allegations" or by "unsubstantiated assertions," or by only a "scintilla" of evidence.  *Little*, 37 F.3d at 1075.

## III.     DISCUSSION

To succeed on a claim for delay or denial of medical treatment under 42 U.S.C. § 1983, a plaintiff must show "deliberate indifference to his serious medical needs." *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991); *see also Estelle v. Gamble*, 429 U.S. 97, 105 (1976). "Deliberate indifference is an extremely high standard to meet." *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). To establish deliberate indifference, a plaintiff must show that the defendant "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id*. (quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)). "[A]n incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference." *Domino*, 239 F.3d at 756. "Furthermore, the decision whether to provide additional treatment 'is a classic example of a matter for medical judgment[,] . . . [a]nd the 'failure to alleviate a significant risk that [the defendant] should have perceived, but did

not' is insufficient to show deliberate indifference." *Id*. (quoting *Estelle*, 429 U.S. at 107 and *Farmer v. Brennan*, 511 U.S. 825, 838 (1994)). On summary judgment, "[m]edical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference." *Gobert v. Caldwell*, 463 F.3d 339, 346 n. 24 (5th Cir. 2006) (quoting *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995)).

The gravamen of Berry's complaint appears to be his medical treatment at CMCF from March 16 until March 22, during which time he presented to the medical clinic several times with chest pain and shortness of breath. Undoubtedly, these complaints were manifestations of a serious medical condition, and it is understandable that Berry would be upset that he was not sent to the hospital sooner. However, neither the medical records nor Berry's version of the facts, which are accepted as true for purposes of this motion, supports a finding that the Wexford Defendants were deliberately indifferent to this medical condition. Berry had a long history of high blood pressure and dyspnea. When on March 16 Berry began experiencing more severe symptoms, Nurse Bishoff, clearly aware of his history and the risk of a cardiac event, treated him pursuant to the clinic's cardiac protocol by giving him medication to lower his blood pressure and relieve his chest pain and by running an EKG and a troponin test. Over the next several days, medical staff, including Nurses Bishoff, Lunski, Allen, and Pope, and Nurse Practitioners Horne and Dorris, attempted, with some success, to lower his blood pressure and stabilize him. In addition to episodic treatment, Nurse Practitioner Horne conducted an extensive cardiovascular, endocrine, and hypertension examination of Berry on March 19. No test administered to Berry during this period was positive for a cardiac event until the EKG of March 22. The medical staff responded to the EKG results by giving Berry nitroglycerin, aspirin, and Clonidine, ordering

further testing, and transferring him by ambulance to the emergency room at CMMC. This record of active treatment and testing, as well as the prompt transfer of Berry to the hospital on March 22, negates his allegations of deliberate indifference.

Furthermore, Berry's claims against the Wexford Defendants fail because he has not shown how the actions of any individual constituted deliberate indifference. The cumulative acts of separate individuals cannot be used to establish the deliberate indifference of any one of them. Rather, a prisoner must establish that each individual defendant acted with subjective deliberate indifference to his serious medical needs. *See Stewart v. Murphy*, 174 F.3d 530, 537 (5th Cir. 1999). This Berry has failed to do.

Finally, Berry's allegations of deliberate indifference as a result of delay in sending him to the hospital fail because he has come forward with no evidence that an earlier transfer to the hospital would have resulted in a better medical outcome. Berry suffered a heart attack and ultimately underwent a successful angioplasty and stent placement. He has not shown that his heart attack could have been prevented or that he could have avoided surgery had he been sent to the hospital earlier. Delay in medical treatment constitutes an Eighth Amendment violation only "if there has been deliberate indifference [that] results in substantial harm." *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993). Berry has not established causation between the harm he suffered and any actions of the Wexford Defendants.

In sum, Berry has not shown that a material fact question exists on whether he was deprived of his constitutional right to medical care. Accordingly, the undersigned recommends that summary judgment be granted in favor of the Wexford Defendants.

Berry also filed suit against the MDOC Commissioner, MDOC Medical Director, CMCF

˘11˘

Superintendent, and CMCF Associate Deputy Warden. "A supervisory official may be held liable . . . only if (1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that causally result in the constitutional injury." *Gates v. Texas Dep't of Prot. & Reg. Servs.*, 537 F.3d 404, 435 (5th Cir. 2008). Berry has failed to identify any such acts by the MDOC Defendants or policies they implemented.[5] Further, since he has not shown a material fact question on whether a constitutional deprivation of medical care occurred, Berry has not met the summary judgment burden on his claims against the MDOC Defendants. Accordingly, the undersigned also recommends summary judgment in their favor.

## IV. CONCLUSION

For the reasons stated above, the undersigned recommends that the defendants' summary judgment motions [118] and [120] be granted, and Berry's summary judgment motions [129], [130], and [141] be denied.

The parties are hereby notified that failure to file written objections to the proposed findings, conclusions, and recommendation contained within this report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. 28 U.S.C. § 636, *Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).

---

[5] In support of his claims against the MDOC Defendants, Berry filed copies of emails expressing concern about his medical care, which were sent by his children to MDOC officials during the night of March 20-21. However, one of Berry's own exhibits, [129-6], shows that on March 21, CMCF Superintendent White emailed Associate Deputy Warden Shivers to "contact medical" and "ensure that [Berry's] needs are addressed," and the medical records show that within an hour, Shivers contacted the CMCF medical clinic about Berry's treatment. *See* [124-5] at 78.

RESPECTFULLY SUBMITTED, this the 17th day of August, 2018.

/s/ F. Keith Ball
UNITED STATES MAGISTRATE JUDGE